# Vernor *against* Henry.

V. devised as follows :—" I give and devise unto the two daughters of my deceased brother John Vernor, and unto John T. Vernor, the grandson of my said brother John deceased, my plantation or tract of land, whereon I now live; to have and to hold the same, to them, the two daughters of my deceased brother John Vernor, and to the said John T. Vernor, their heirs and assigns forever in fee, that is to say, each of them to have an equal, undivided third part thereof." John Vernor, the testator's brother, having had three daughters when the will was made, and at the death of the testator, *Held*, that the devise was not void for uncertainty, but that the three daughters took by it two thirds of the land.

A residuary legatee may use the names of the executors of a will under which he claims, without their consent, in an action to enforce his claim under the will.

[Vernor v. Henry.]

ERROR to the district court of *Lancaster* county.

Ejectment.   Michael Musselman, John Robinson, and John T. Vernor, executors of Benjamin Vernor, deceased, against Christian Fisher and others.

When this suit was brought, all the executors of Benjamin Vernor, the plaintiffs, filed a paper declaring that it was instituted without their consent or knowledge, and disclaiming all liability and responsibility therein, and directed that the same should be discontinued.

On the same day, a warrant of attorney was filed from Robert R. Henry to William Norris, Esq, authorizing the institution for him; and which recited the material parts of the will of Benjamin Vernon deceased, to show that he was interested as a residuary legatee.

Mr Ellmaker, on behalf of the plaintiffs, moved that a discontinuance of those suits, be entered according to the direction of the plaintiffs, in writing filed.

This being opposed by the counsel of Robert R. Henry, the motion was argued in October, and held under advisement.

· The motion was supported on the ground, that the present suit was unnecessary to ascertain Robert R. Henry's rights, and if necessary, he had not indemnified the executors, in whose name he sues, for all costs and damages which they may sustain.

It was opposed on the ground, that the suit was expedient and necessary, and that all costs and expenses of the proceedings are chargeable to the estate of the testator.

Hayes, president.   The practice of suing and defending in the names of others, so far as it has obtained among us, has grown out of the desire of reaching the real justice of certain cases, and the difficulty of accomplishing the purpose, on account of the want of a chancery jurisdiction, or some other peculiarity in our acts of assembly, rendering the common law methods, either not precisely applicable, or inadequate.

Hence the settled usage of bringing suits in the name of a legal plaintiff, marking them to the use of the party, who is alone interested, and who assumes the sole control and responsibility; whilst the nominal plaintiff cannot interfere by discontinuance or otherwise, and is not considered as amenable for costs or charges.

Hence also, the privilege of the terre-tenants, or heir of a decedent, to come in and defend their particular interest, in a suit brought against the executor or administrator.

、  To this cause are owing our equitable pleas and actions founded on equitable rights.

There can be no fairer field, for the exercise of that attribute commended in the maxim *est boni judicis ampliare jurisdictionem;* the direct object, being to do justice in every case, according to the very right of the matter, and the law of the land.   In truth, our system of jurisprudence must always be deficient in

VI.—z

attainable excellence, until by means of our process and pleadings, we afford to every suitor, as ample redress, as can, under similar circumstances be procured, either in the common law courts, or courts of chancery in those of our sister states, in which both exist together; until then, we must, in some degree, be obnoxious to the reproach of having rights, for which we have no remedies.

All that it is necessary to decide at present, is, whether Robert R. Henry, as residuary legatee, is entitled to bring this action, for the purpose of ascertaining, if the executors of Benjamin Vernor deceased can recover the two-thirds of the Leacock plantation, in order to sell and dispose of the same, in the execution of the last will and testament of their testator? and I am of opinion that he is.

With regard to the liability of the executors for costs, I am not able to perceive how they can suffer in that respect. That they cannot be obliged to pay any thing *de bonis propriis*, I think is very clear. The claim of an indemnity is not supported. So far as relates to the responsibility of the executors, their disclaimer filed in the present cause, may hereafter be referred to for such protection as it may furnish.

The decision upon the motion under consideration, is, that Robert R. Henry may avail himself of the names, character and privileges of the executors for the investigation of his rights as residuary legatee in this action.

The motion to enter a discontinuance is therefore denied.

Case stated.

Benjamin Vernor, of Leacock township, Lancaster county, being seised in his demesne, as of fee, of and in, *inter alia* the mansion farm, hereinafter described, did by his will, duly made and executed on the 5th day of June 1830, devise the same in manner following, to wit: "I give and devise unto the two daughters of my deceased brother, John Vernor, and unto John T. Vernor, the grandson of my said brother, John Vernor, deceased, my plantation or tract of land, whereon I now live, situate in Leacock township, in the county of Lancaster, adjoining land of Thomas Lyon, John M'Caskey, Thompson Jacobs, and others, on the old Philadelphia road, containing upwards of two hundred acres, should it be more or less. To have and to hold the same, to them, the two daughters of my deceased brother, John Vernor, and to the said John T. Vernor, their heirs and assigns, forever, in fee, that is to say, each of them to have an equal, undivided third part thereof."

This will was drawn by Israel Carpenter, who testifies in regard to it, as follows: "I never had any conversation with Benjamin Vernor, before the time I took the notes of the first will I wrote. This was at his house. I took the notes one day at his house, and drew the will, and took it down to his house, to get him to sign it. I saw him twice; once at the taking of the notes of the alterations he intended, and the next, when I went down to get him to sign

the will I had drawn. Have you not said repeatedly, since the death of Benjamin Vernor, that you recollected nothing of the will of Benjamin Vernor, except what was in it? No; but I have said, and still say, that I do not recollect any conversation that we had in so many words, or the words that were used. I mentioned so to Robert R. Henry and Mr. Henry, when they asked me. Is it not your practice as a scrivener, when called to draw a will, to write down the words as they come from the lips of the testator? No sir. What is your practice? It is to ascertain the wishes and intentions of the testator, as well as I can, and then put them in such words in my notes, as will stand in law. Is it your practice to advise or dictate to a testator, how he shall dispose of his property? No, I never do. Did you do so in the slightest degree in this case? No, I did not. Is it your practice to divulge a will when you write it? No."

And it is proved by Daniel Moore, whose deposition was taken on the 22d of September 1835, and filed of record in this cause, on the 24th of the same month, as follows, to wit: "That he entered the counting house of Vernor and Henry, wholesale merchants in the city of Albany, and state of New York, in the spring of the year 1792, and remained in the counting house about three years, when he commenced business, and from the above stated time, till he was married, in August 1798, lived in the family of Robert R. Henry, one of the co-partners, above mentioned. Deponent married Ewretta Catharine Clinch, niece of Benjamin Vernor, late of Lancaster county, commonwealth of Pennsylvania, deceased, and during and since his residence in Albany, had and has an intimate knowledge of the Vernor, Henry, and Church families. John Vernor, brother of Benjamin Vernor, the testator, had one son, John Vernor, Jun., and three daughters, to wit: Martha, Margaret, and Mary, whom deponent knew personally, and is well acquainted with them, they being first cousins of his former wife, Ewretta aforesaid. Deponent was in Albany in the year 1830, and the aforementioned Mary informed him, her two sisters were well; Margaret being at some of the watering places, and Martha at her usual residence in the country, since which deponent hath frequently heard of them, and has no reason to think either of them defunct. Deponent moved to Lancaster, aforesaid, in the year 1811, and from that time until 1829, was the intimate friend and confidential agent of Benjamin Vernor, the testator, deponent's wife being his favourite niece, (as he declared,) frequent visits were alternately made between us, and generally, mutual conversations occurred relative to the family connections, and deponent knows from these conversations so frequently held, from 1811, until some time in 1829, that at the last mentioned time, the testator, Benjamin Vernor had a perfect and distinct knowledge, that his brother John, deceased, had three, and only three daughters, in 1829, viz. Martha, Margaret, and Mary, aforesaid. Deponent

never did, nor any other person in his presence, hold any conversation, direct or indirect, with testator, relative to the disposition of his property by will, nor does he believe any human being, except the person or persons employed to write his will or wills, could have the most distant idea of testator's intentions."

Benjamin Vernor, the testator, died on the 22d of November 1831, and his will dated on the 5th of June 1830, was duly proved on the 24th of November 1831. Martha, one of the daughters of the testator's brother John, was, at the time of the death of Benjamin Vernor, the wife of William Hilton; Margaret, another of the daughters, was the widow of Charles D. Cooper; and Mary, the third daughter, was the widow of John Cuyler.

On the 30th of October 1832, the said William Hilton, and Martha, his wife, Margaret Cooper, and Mary Cuyler, by their deed, duly executed and acknowledged, for the consideration of 13,000 dollars, conveyed to John T. Vernor, the two-thirds of three hundred and one acres and ninety-eight perches, in Leacock township, the same premises devised by the will of Benjamin Vernor, in the manner before stated.

On the 13th of March 1833, the said John T. Vernor and wife, by their deed, duly executed and acknowledged, conveyed to Christian Fisher, the same premises, in consideration of 21,791 dollars 50 cents.

On the 1st of April 1833, the said Christian Fisher and wife, by their deed, duly executed and acknowledged, conveyed to David Smoker, for the consideration therein mentioned, fifty-two acres and forty-five perches, part of the above mentioned premises.

On the same day, the said Christian Fisher and wife, by their deed, duly executed and acknowledged, conveyed to Tobias Miller, twenty-four acres and one hundred and thirty-two perches, part of the same premises.

On the 1st of April 1833, Christian Fisher and wife, by their deed, duly executed and acknowledged, conveyed to Henry Buckwalter, ninety-six acres and one hundred and forty-two perches, part of the same premises.

On the same day, Henry Buckwalter and wife, conveyed to Daniel Zuch, ten acres, part of the last mentioned premises, by their deed, duly executed and acknowledged.

On the same day, the said Daniel Zuch and wife, by their deed, duly executed and acknowledged, conveyed the same premises, *inter alia*, to Catharine Yeates.

On the same day, Henry Buckwalter and wife, by their deed, duly executed and acknowledged, conveyed to Catharine Yeates, ten acres, part of the ninety-six acres and one hundred and forty-two perches, above mentioned.

John T. Vernor, by his deed, conveyed to Joel Baker, about a quarter of an acre.

Daniel Royer is a tenant of Christian Fisher, but Henry Stam-

back never owned or occupied any part of Benjamin Vernor's lands.

The residuary legatees, known to have been living at the death of Benjamin Vernor, are as follows, viz: Martha, wife of William Hilton; Margaret, widow of Charles D. Cooper; Mary, widow of John Cuyler; daughters of John Vernor, a brother of Benjamin Vernor's.

Robert R. Henry, son of Elizabeth and Robert Henry, which Elizabeth was sister of Benjamin Vernor.

Martha, wife of William Hallowell, which Martha was a daughter of the said Elizabeth, sister of Benjamin Vernor.

Benjamin Vernor Clinch, a son of Robert and Hannah Clinch, which Hannah was a sister of Benjamin Vernor, deceased.

Elizabeth, widow of          Clinton, which Elizabeth is a daughter of the said Hannah, a sister of Benjamin Vernor, deceased.

Mary Vernor, a sister of Benjamin Vernor, deceased, was married to          Douglass, and it is said, she had two children, but whether any of her children were living, at the death of the said Benjamin Vernor, is uncertain.

Benjamin Vernor died November 22d 1831: His will dated 5th June 1830; proved November 24th 1831; he had three brothers and three sisters, viz: 1. Samuel, died unmarried; 2. John, died in 1828; 3. James, died unmarried; 4. Elizabeth, married to Robert Henry; 5. Mary, married to  .  Douglass; 6. Hannah, married to Robert Clinch.

2. John Vernor had four children, viz: John, died in 1822, leaving five children, viz: Eve Humphrey, widow of Barent C. Humphrey; Mary De Graff, widow of Herman De Graff; Margaret Vernor; John T. Vernor; Hannah Vernor. Now living, Martha, wife of William Hilton; Margaret, widow of Charles D. Cooper; Mary, widow of John Cuyler.

4. Elizabeth Henry had seven children, viz: John, died in infancy, in 1769; John Vernor, died in October 1829, leaving thirteen children, of whom James Vernor Henry is the eldest. Now living, Robert R.— James, or James Vernor, died unmarried in 1793, aged about 20 years. Now living, Martha, wife of William Hallowell. Elizabeth, died in infancy, in 1779. Benjamin, died unmarried, in 1804.

5. Mary Douglass. Children unknown.

6. Hannah Clinch had four children, viz: John Ralph, Thomas Barton. Now living, Benjamin Vernor, Elizabeth, widow of          Clinton.

The precipe and writ issued in this case, the disclaimer of the executors of Benjamin Vernor, filed the 9th of June 1834, and the warrant of attorney of Robert R. Henry, filed on the same day, and all other papers filed in the cause, and the whole record.

If, upon the whole case, the court should be of opinion, that the law is with the plaintiffs, judgment to be rendered in their favour,

according to their right; but if of a contrary opinion, then judgment to be rendered in favour of the defendants.   Either party to be at liberty to take a writ of error.

Will of Benjamin Vernor.

In the name of God, amen!  I, Benjamin Vernor, of Leacock township, in the county of Lancaster, and Commonwealth of Pennsylvania, being old and weak in body, but of sound mind, memory, and understanding, blessed be God for the same; do make and publish, this, my last will and testament, in manner and form following, to wit.  Principally, and first of all, I commend my immortal soul into the hands of God who gave it, and my body to the earth, to be buried in a decent and Christian-like manner, at the discretion of my executors hereinafter named.   And as to such worldly estate, wherewith it has pleased God to bless me in this life, I give and dispose of the same, in manner following, to wit:

*Imprimis.*    I order and direct, that all my just debts and funeral expenses shall be fully paid and satisfied out of my estate, by my executors hereinafter named, as soon as conveniently can be done after my decease.

*Item.*    I give and devise unto the two daughters of my deceased brother, John Vernor, and unto John T. Vernor, the grandson of my said brother John Vernor, deceased; my plantation, or tract of land whereon I now live, situate in Leacock township, in the county of Lancaster, adjoining land of Thomas Lyon, John M'Casky, Thompson Jacobs and others, and the old Philadelphia road, containing upwards of two hundred acres, should it be more or less.   To have and to hold the same to them, the two daughters of my deceased brother, John Vernor, and to the said John T. Vernor, their heirs and assigns forever, in fee, that is to say, each of them, to have one equal undivided third part thereof.

Then followed a number of pecuniary bequests.

*Item.*  I do order and direct, and hereby authorize and empower my executors hereinafter named, and the survivors or survivor of them, to sell and dispose of by private or public sale, to the best advantage they can, as soon as conveniently and advantageously can be done, after my decease, all my real estate, lands, and tenements, with the appurtenances in such parts or parcels, as my said executors or the survivors or survivor of them may think proper, meaning such of my real estate, as I have not hereinbefore given or devised; such residue so to be sold, consisting of sundry tracts or parcels of land, to wit: certain houses and buildings, and lands, in Strasburg township, Lancaster county, containing together about eighteen or twenty acres; about five acres and three quarters of woodland, called the "Mine Hill," in the same township; about sixteen acres of land, in Leacock township, at Muddy Run, with a brick house thereon.   Also, a lot of three acres of land in the latter township; about twenty-four acres and one half of land, in Sadsbury township, Chester county, and a tract of land belonging

[Vernor v. Henry.]

to me, situate in Jefferson county, in the state of Kentucky, containing four hundred and twenty-seven acres, be it more or less; and all my other lands and real estate, with the appurtenances, whatsoever and wheresoever not hereinbefore devised as aforesaid. And I do hereby authorize and empower my executors hereinafter named, and the survivors and survivor of them, to sign, seal, acknowledge, and deliver good and lawful deeds of conveyance, for the premises ordered to be sold as aforesaid to the purchasers thereof, their heirs and assigns forever, in fee, which deeds shall be as good in law, as if I had made the same in my lifetime, to all intents and purposes.

*Item.* I give and bequeath to my friend, Joel Baker, Esq., and his heirs, the sum of 300 dollars, lawful money.

*Item.* All the rest, residue and remainder of my estate, real, personal and mixed, moneys and outstanding debts, due and owing to me, including the proceeds of 'sale of the real estate herein ordered to be sold, and the said sum of 1000 dollars ordered to remain at interest as aforesaid, which will become distributable at the death of Rachael Miller, in case she die without issue: after all legacies and bequests herein before given and bequeathed, shall be deducted therefrom, I give, devise and bequeath the same unto all and every my nephews and nieces, the children of my deceased brothers and sisters, who shall be living at my death, and their heirs, in equal shares and parts.

And lastly, I hereby nominate, constitute, and appoint my trusty friends and neighbours, Michael Musselman and John Robinson, Esq., both of the county of Lancaster aforesaid, and John T. Vernor, the grandson of my deceased brother John, and the survivors and survivor of them, to be the executors of this, my last will and testament: hereby revoking all other wills, legacies and bequests by me heretofore made, and declaring this and no other, and this only, to be my last will and testament. In witness whereof I, Benjamin Vernor, the testator aforesaid, have hereunto set my hand and seal, the 5th day of June, in the year of our Lord 1830.

The court below (Hayes, president) delivered an opinion, and came to the conclusion that the devise was not void for uncertainty, but that it was a good devise to the three daughters of John Vernor.

*Norris,* for plaintiff in error.     To establish the principle that the intention of a testator must be judged of by the words used in the will, *ex visceribus suis,* and not from conjecture, he cited *Raym. on Wills* 31; 4 *Law Lib.* 18; 5 *Co. Rep.* 68; 1 *Bos. & Pul.* 250; 2 *Vez.* 61, 73; 1 *Hov. on Frauds* 345; 1 *Roper* 143; 2 *Binn.* 13; 3 *Binn.* 476; 14 *Serg. & Rawle* 84.

The heir at law will not be disinherited, but by express words or necessary implication. *Raym. on Wills* 140; 4 *Rawle* 81; 2 *Bro. Ch.* 86; 2 *Vez.* 560.

If the devise be void, the subject of it belongs to the residuum,

and therefore goes to the executors for the benefit of the residuary legatees. 13 *East* 531, 535; 4 *Kent's Com.* 541; 5 *Pick. Rep.* 528.

*Montgomery* and *Ellmaker*, for defendants in error. In the construction of wills, it must be intended that the testator meant something, and a devise shall not be declared void if any reasonable interpretation can be put upon it. 1 *Vez.* 255; 1 *Atk.* 411; 3 *Binn.* 149; 2 *Dall.* 244; 1 *Yeates* 508; 3 *Yeates* 187; 2 *Term Rep.* 498; 7 *Ibid.* 701..

Mistakes in wills are alike corrigible, whether the property disposed of thereby be real or personal; and this in courts of law, as well as in equity. 2 *Stark.* 925, *note O; 2 Vez.* 216; *Cro. Car.* 447; *Styles* 293; *Dyer* 333; *Shep. Touch.* 433; 2 *Wash. C. C. Rep.* 475.

When a devise is to a class of persons designated as three, when in fact there are four, all shall take; and the devise is not void for uncertainty. 1 *Bro. Chan.* 31; 2 *Vez.* 561; 1 *Rop. on Leg.* 143; *Hov. on Fraud* 345.

The heir at law will not be divested of the estate, unless it be expressly given away from him. 1 *Forts. Rep.* 182; 4 *Paige's Rep.* 114; *Amb.* 328, 645; 1 *Hov. on Fraud* 363; 15 *Vez.* 415; 8 *Vez.* 25; 2 *Wms. on Ex'rs* 895; 2 *Roper* 455; 6 *Conn. Rep.* 292.

Words in a will may be discarded or superadded, to give it effect. *Cruise's Dig. tit.* 38; *Devise, ch.* 9, *sect.* 15; 12 *Mass.* 543; 1 *Wend.* 541; 6 *Peters* 68.

The opinion of the Court was delivered by

KENNEDY, J.—Benjamin Vernor, *inter alia*, devised by his will in the following terms: " I give and devise unto *the two* daughters of my deceased brother, John Vernor, and unto John T. Vernor, the grandson of my said brother, John Vernor, deceased, my plantation or tract of land whereon I now live, situate in Leacock township, in the county of Lancaster, adjoining land of Thomas Lyon, John M'Casky, Thompson Jacobs and others, and the Philadelphia road, containing upwards of two hundred acres, should it be more or less; to have and to hold the same to them, *the two* daughters of my deceased brother, John Vernor, and to the said John T. Vernor, their heirs and assigns forever, in fee; that is to say, each of them to have one equal undivided third part thereof." The testator also, in a subsequent part of his will, directs as follows: "I do order and direct, and hereby authorize and empower my executors hereinafter named, and the survivors or survivor of them, to sell and dispose of by private or public sale, to the best advantage they can, as soon as conveniently and advantageously can be done, after my decease, all my real estate, lands and tenements, with the appurtenances, in such parts or parcels as my said executors, or the survivors or survivor of them may think proper; meaning such of my real estate as I have not hereinbefore given or devised, wheresoever the same may be situate." And in the close he appoints the plain-

[Vernor v. Henry.]

tiffs executors of his will. They, as such, claim to recover the land devised to the two daughters of the testator's brother John, on the ground that the devise of it to them is void for uncertainty, there being, at the time of making the will, as also at the death of the testator, three daughters of his brother John; and it being impossible to ascertain which two of the three, if he only intended two, the testator meant to make the objects of his bounty, the devise, as the plaintiffs' counsel contend, is therefore void *ab initio*, and the land embraced in it must be considered as forming a part of the *residuum* of the testator's real estate, and as passing, by his will, under the residuary clause to the executors, that they may sell and dispose of it in conformity to the direction therein contained. This inference, however, that it would pass to the executors, even if the devise be void, as the plaintiffs' counsel allege, the counsel for the defendants deny. They contend, and have endeavoured to show, that a testator who has undertaken to dispose of any part of his real estate *specifically by a devise thereof*, which turns out to be void for uncertainty, cannot be considered as having passed it by his residuary devise; because that would be contrary, as they contend, to his intention, as expressly manifested in the void devise; which, though it be insufficient to pass the land mentioned in it, yet being in the will, it must be taken as part of it, provided it can have any legal effect at all; and being clearly sufficient to show, if nothing more, that the testator did not intend to include it in the residuary devise, it is to be regarded as having the effect of an exception, at least of so much of his real estate therefrom; and therefore, on his death, his heirs at law must be considered as having become the owners thereof by descent.

This court, however, being of opinion that the devise to *the two* daughters of John Vernor is to be construed as a devise to *all* his daughters, and therefore not void but good, it becomes unnecessary to decide this latter question; so that we do not wish to be understood as expressing any opinion upon it.

Then as to the question of uncertainty. It cannot be said there is any ambiguity on the face of the devise. The terms of it would seem, naturally enough, to import that John Vernor, the brother of the testator, had but *two* daughters, otherwise the testator would have undertaken to have designated the two he meant in some way, that they might be distinguished from the rest, if he had known at the time that there were more than the two. In the absence of all evidence, arising either from the face of the will itself, or otherwise, as it appears to me is the case here, tending to show the contrary, it would also seem to be the only natural, if not indeed, the necessary inference, that can be drawn from the whole structure of the sentence containing the devise, that the testator made these daughters of his brother John, his devisees, merely because they were the daughters of his brother. To repel this,

VI.—2 A

however, a sort of ambiguity has been raised by the introduction of parol evidence on the part of the plaintiffs, showing that his brother John Vernor had left three daughters, who were living at the time of making the will, and also, at the death of the testator. But then it does not appear from this evidence, that the testator had any personal knowledge of any of the daughters of his brother John, or that he had ever seen any of them; indeed, it would rather seem that he had not; nor does it appear, that he would have had any motive for preferring any one of them to the other two, much less any two of them to the third, from which the law presumes, that he intended to give to all of them, and that he inserted a less number through mistake. But, notwithstanding this, it has been argued, that as the testator has by express terms, limited the devise to the two daughters of John Vernor, two, and no more can claim to take; and as it does not appear which two of the three, the testator intended should take, the devise is, therefore, void for this uncertainty. This, however, seems to be straining the words of the will, and the evidence brought in connection with them, beyond their natural import: for it cannot, I think, be fairly said, that the words, "the two daughters of my deceased brother, John Vernor," without farther designation or explication, necessarily mean a less number, than what the testator thought was the whole of the daughters of his brother. These terms, thus situated, as it appears, would rather seem, as has been suggested above, to convey the idea, that two were all the daughters the testator believed his brother John had left; and having no reason that can be perceived, to prefer a part of them to the whole, it renders it *highly probable*, if not necessarily inferrible by implication, that he intended to give to all, and to make them participate equally in his bounty. If it be highly *probable*, that such was the intention of the testator, that is enough: it is not requisite that such should appear to have been his intention, either by express words, or those having such *necessary implication*, as was laid down with regard to his disinheriting his heir at law, in Gardner *v.* Sheldon, *Vaugh.* 262, 3. For Lord Chief Justice Willes has shown very clearly, in Fagge *v.* Heaseman, *Willes's Rep.* 140, that even in the case of the heir at law, the rule, that he shall never be disinherited, except by express words, or such as have a necessary implication, is not to be taken strictly, or it would overturn a great many resolutions: and he exemplifies the truth of his position, by referring to the principle, which has been established by cases and authorities almost without number, that gives to the devisee of real estate the fee-simple, if he be charged with the payment of the testator's debts, or a certain sum of money in goods, though the sum be not equal to one-tenth part the value of even a life estate, much less a fee-simple in the subject of the devise: and concludes, by saying, "for though this expression of paying the debts, &c. makes

[Vernor v. Henry.]

it highly *probable* that it was the devisor's intention that the devisee should have an estate in fee, yet it is *very far* from being a *necessary* implication.

Now in the present case, the circumstance of the testator's having used the definite article "the," in connection with the word "two," shows pretty clearly, that he dictated and made his will under the belief that his brother had left but *two* daughters: for if he had been impressed differently, and had then recollected that there were three, according to what he had been before told, perhaps more than once; and he had only intended to give to two of them, it is difficult, if not impossible to account for his having omitted to designate or describe in some way, the two whom he intended to make the objects of his bounty; so that they might be distinguished from the third, whom he wished and had determined to exclude. Certainly, the circumstances of the testator's being a man of more than ordinary cast of mind, and perfectly *compos mentis* at the time of making his will, as also that of the scrivener, who drew it, being an expert in his art, which has been so repeatedly mentioned and brought to view by one of the counsel for the plaintiffs, does not in the slightest degree tend to remove the difficulty of accounting for such omission, if it was really so; but on the contrary, so far as it can be made to have any bearing on the matter, rather goes to show that the testator and scrivener, possessing more than ordinary intelligence and discernment, could not have been guilty of such a glaring and palpable omission, knowing that John Vernor had left three daughters instead of two. The parol evidence then taken in connection with the scope and tenor of the will proves no more than that the testator made it under the impression that his brother John had only two daughters; and that in giving to them as " *the two* daughters of his deceased brother John," he supposed he was giving to *all* the daughters his brother had left, in which, it seems, he was mistaken as to the number; there being three, instead of two. Hence, it would appear, that the daughters of the testator's brother John, are mentioned and treated by him as a class of persons; all standing in the same relation to him; all alike known and dear to him; and all embraced under the same description in the will, to whom he intended to be equally bountiful. But it is objected, that if the devise is to be made good to the daughters, on the ground that it is given to them as a class, John the grandson will fall within the same class, as he is united with them in the devise; and his rights will be affected, contrary to the clear direction of the testator, who has given to him *eo nomine* in express terms one undivided third part of the whole plantation in fee. It is certainly true, beyond all cavil or dispute, that one equal undivided third part of the whole plantation is given in fee to the grandson, and his right to that extent cannot be impaired, without overturning what must be considered to have been the settled purpose of the testator. But the grand-

son, though made by the terms of the devise, a tenant in common with the daughters, and as such, entitled to an undivided third of the plantation, yet he is clearly not included within the designation or description, which embraces the daughters, and therefore, cannot properly, much less necessarily, be said to fall within their class. Then what is there to prevent the remaining two-thirds of the plantation from being equally divided among the three daughters of the testator's brother John, as a class? one-third thereof would seem to have been given by the testator to each of *the two* daughters, merely because he thought at the time there were only two of them. And even supposing, if he had known at the time of making his will, that there were three, that he would have given three-fourths of the plantation to be equally divided among them, it is certainly no reason why they should not have the two-thirds thereof, which he has given in express terms to the two, believing that that number would embrace all. All the daughters, therefore, of his brother John, seeing they stand in the same degree of relationship to the testator, and come within the same description, as the objects of his bounty, may fairly be considered as forming a class, to each individual of which he intended to be alike generous. The circumstance that the testator has given an undivided third of the plantation *in form* to each of *the two* daughters of his brother John, is not to be regarded as an insuperable objection to the *presumption* here, that he intended to benefit equally, *all* the daughters of his brother. For in Stebbing *v.* Walkley, 2 *Bro. Cha. Ca.* 85, the bequest was of 82 pounds, three per cent. annuities, in trust for *the two* daughters of Titus Stebbing *in equal shares* for so much of the term therein as they should live; and if *either* died before the end of the term, the whole was to belong to the *survivor;* but if *both* died before that time, the legacy was to fall into the residue. Titus Stebbing, however, had *three* daughters at the date of the will; and Lord Kenyon held, that the three were entitled to take equally. In this case of Stebbing's, it is also manifest, as in the case before us, that the number " two" was not inserted through a mere slip of the pen, contrary to the design of the testator; for the whole structure of the sentence, giving the legacy, shows that two was the number intended to be inserted. But as the testator omitted to name them or to describe them, otherwise than as *the two* daughters of Titus Stebbing, Lord Kenyon felt himself bound by previous decisions, which, in his opinion, established the rule, that from necessity, rather than the legacy should be declared void, on account of the impossibility of discovering which two of the three daughters were intended, it should be *presumed* that the testator intended to give the legacy to all of them, and that he introduced the number two, under the apprehension that it included all the persons in being of the description mentioned, and the word " two" therefore, being a mistake, ought to be rejected in reading or construing the will. It is apparent, that the case just cited, runs

upon all fours with the present; and that, if it were rightly decided, it sustains to the fullest extent, the decision of the court below.   It is true, however, that Lord Kenyon did not seem to be satisfied with the reason of the rule which governed his decision, but he admitted that it had been too firmly established by previous decisions, to be either set aside or disregarded; consequently, it had become a rule of property which gave it an imperative force.   That Lord Kenyon was right in considering the rule, according to which he decided the case before him, settled, appears very clearly from the cases cited on the argument.   The first was Tompkins *v.* Tompkins, settled before Lord Hardwicke, in conformity to his opinion in 1745, where the testator gave to *the three* children of his sister, 50 pounds each.   The sister had *four* children, and they were all let in; see this case in 2 *Ves.* 564, and in 19 *Ves.* 121, in notes.   Next come Sleech *v.* Thorington, 2 *Ves.* 560, decided by Sir Thomas Clarke, master of the rolls, in 1754.   In this case, the testatrix, who had two servants living with her at the time of making her will, but took another afterwards, and had three at her death, gave a legacy of 100 pounds unto *the two* servants that should live with her at the time of her death, to be *equally divided between them;* and it was decreed that the three were entitled to receive equal portions of the 100 pounds.   Then followed the case of Scott *v.* Fenhaulet, determined in 1779, first by Lord Bathurst, and again by Lord Thurlow, 1 *Cox* 79, in which the testator bequeathed to Captain Compton 500 pounds, and the like sum to each of his daughters, if *both* or *either* of them survived Lady Chadwick.   The captain, however, had three daughters at the date of the will, who survived Lady Chadwick; and it was decreed, that each of the three was entitled to receive a legacy under the will.

Now, it is proper to remark here, that two of these cases were determined before the American revolution, and may therefore have been very properly regarded by the profession here, as binding authority.   It may also, therefore, well be, that the rule of construction adopted in these, and followed in all the subsequent cases in England, has been received and observed here in settling and adjusting the rights of property.   This consideration, if there were no other, would render it unsafe for us to reject the rule, notwithstanding the reasonableness of it has been questioned by some, and may not be seen by all; because it might affect very materially many innocent holders of property in their right to the enjoyment thereof, hereafter.

But from the views presented by me on the subject, it has doubtless been seen, that I am not one of those who doubt the sufficiency of the reason of the rule, or look upon it as being founded upon conjecture, in regard to what was the intention of the testator.   On the contrary, I consider it as having for its basis, the intention of the testator, which is rendered at least highly probable by

the face of the will and the parol evidence taken together; and that by means thereof, the intention of the testator is carried into effect, which is the first and great object in the construction of all wills. It is merely correcting a mistake of the testator made manifest, as to the true number of those who appear to have been all alike the objects of his bounty; and this is done either by striking out the *number* inserted, without more, or by reading it as if it were written "all" instead of "two," or "three" as it may happen to be. This is every day's practice in the construction of wills, in order to effectuate the plain intention of the testator, as for instance "or" is construed "and," and so *vice versa*. Mr. Roper, who has collated the cases on this subject, lays it down as settled, "that if a testator bequeath to part only of a number of individuals of the same description, and none of them are named nor can be identified, either *by the will* or by *extrinsic evidence*, it is to be *presumed* that he intended the whole class of persons, and was mistaken in the number when confining his bounty to *three* or *four* of the class by the insertion of those words. These restrictive expressions are therefore rejected, and the entire number of individuals answering the description are admitted as legatees."

It has, however, been further objected by the counsel for the plaintiffs, that this *presumption* cannot be made under similar circumstances, where the gift is a devise of real estate. But there does not appear to be either authority or reason for making such a distinction. In the case of a bequest of personal estate, all the persons of the same description take, because the law under the special circumstances, by a rule of construction, *presumes* that the testator *intended* it for them; and why under the same circumstances, the same intention in the case of real estate, ought or cannot be presumed, I cannot imagine. It is the intention of the testator, when ascertained, that is to govern in either case; and it is certainly reasonable, as well as absolutely necessary, in order to make the law consistent with itself throughout, that the same meaning and intention should be ascribed to the testator, when he has used precisely the same words in the one case that he has done in the other.

Judgment affirmed.